**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

BONITA A. POWERS, INDIVIDUALLY      CASE NO. _____
AND AS EXECUTRIX OF THE ESTATE OF
JAMES C. POWERS, DECEASED,         JUDGE _____
3284 West Lake Road
Canandaigua, Ontario County, NY 14424

       Plaintiff,

    vs.                                **COMPLAINT**

CLEVELAND CLINIC FOUNDATION
9500 Euclid Avenue
Cleveland, Ohio 44195

and                                   **JURY TRIAL DEMANDED**

VIDULA T. VACHHARAJANI, M.D.
9500 Euclid Avenue
Cleveland, Ohio 44195

and

ANITA JUNUTHULA REDDY, M.D.
9500 Euclid Avenue
Cleveland, Ohio 44195

and

MARK A. MARINESCU, M.D.
9500 Euclid Avenue
Cleveland, Ohio 44195

and

MARIE M. BUDEV, D.O.
2049 E. 100th Street, Suite A-90
Cleveland, Ohio 44116

and

LOUIS S. LAM, M.D.
9500 Euclid Avenue
Cleveland, Ohio 44195,

Defendants.

## COMPLAINT IN CIVIL ACTION

AND NOW, comes Plaintiff, Bonita A. Powers, individually and as Executrix of the Estate of James C. Powers, Deceased, by and through her attorneys, Nomiki P. Tsarnas, Esquire and Kisling, Nestico & Redick, and George R. Farneth II, Esquire and The Farneth Law Group, LLC, and files this Complaint in Civil Action, averring as follows:

## INTRODUCTION

By certified mail dated April 15, 2020, Plaintiff timely provided each of the Defendants with a "180 Day Letter" as authorized by the applicable Rules. Although some intentionally or otherwise delayed in doing so, each of the Defendants accepted service of the 180 Day Letter, except for Vidula T. Vachharajani, M.D. who to date has refused to accept service but who did receive and/or should have received timely notice by and through Cleveland Clinic. Plaintiff also believes that any delay in Defendants' acceptance of Plaintiff's 180 Day Letter was due, in part, to the COVID-19 pandemic and well-known election-related and other problems with the United States Postal Service. For those reasons and the reasons set forth herein, Plaintiff's original Complaint was timely filed at Case No. 1:20-cv-02293 ("Original Lawsuit"). Pursuant to an agreement between counsel and by Amended Order dated February 9, 2021 the Honorable Dan Aaron Polster dismissed the Original Lawsuit, without prejudice, with Plaintiff having the right to refile the Original Lawsuit within one year. Because Plaintiff has refiled this case within one year, this lawsuit was timely filed.

## THE PARTIES

1.     Plaintiff, Bonita A. Powers, individually and as Executrix of the Estate of James C. Powers, Deceased, ("Plaintiff") is an adult individual who, at all times pertinent hereto, resided at 3284 West Lake Rd., Canandaigua, Ontario County, New York 14424.

2.     Plaintiff's Decedent, James C. Powers ("Decedent") was an adult individual who, at the time of his death, resided at 3284 West Lake Rd., Canandaigua, Ontario County, New York 14424, but who had been hospitalized at Cleveland Clinic in Cleveland, Ohio.

3.     Plaintiff and Decedent were married on August 27, 1977 and during their marriage they had three children, Jennifer Lynne Powers Shah (1/16/79), Meghan Meredith Powers (5/3/83), and Alexandria Elizabeth Powers (6/16/88).

4.     Decedent was born on November 16, 1948 and died on April 22, 2019 at the age of 70.

5.     On June 14, 2019, the Surrogate's Court of the State of New York, Ontario County issued to Plaintiff Letters Testamentary as Executrix of the Estate of James C. Powers, Deceased at File No. 2019-215.

6.     Defendant, Cleveland Clinic Foundation ("Clinic") is a medical institution which was/is duly organized, existing and licensed under the laws of the State of Ohio which, at all times pertinent hereto, maintained a principal place of business located at 9500 Euclid Ave., Cleveland, Ohio 44195.  Plaintiff is asserting professional liability claims against Clinic.

7.     Defendant, Vidula T. Vachharajani, M.D. ("Vachharajani") was, at all times pertinent hereto, an adult individual who was engaged in the practice of medicine, specifically critical care medicine, who is believed to have been duly licensed for such practice under the laws of the

State of Ohio, and who maintained a principal place of business 9500 Euclid Ave., Cleveland, Ohio 44195. Plaintiff is asserting professional liability claims against Vachharajani.

8. Defendant, Anita Junuthula Reddy, M.D. ("Reddy") was, at all times pertinent hereto, an adult individual who was engaged in the practice of medicine, specifically internal medicine, critical care medicine, and pulmonology, who is believed to have been duly licensed for such practice under the laws of the State of Ohio, and who maintained a principal place of business located at 9500 Euclid Ave., Cleveland, Ohio 44195. Plaintiff is asserting professional liability claims against Reddy.

9. Defendant, Mark A. Marinescu, M.D. ("Marinescu") was, at all times pertinent hereto, an adult individual who was engaged in the practice of medicine, specifically critical care medicine, who is believed to have been duly licensed for such practice under the laws of the State of Ohio, and who maintained a principal place of business 9500 Euclid Ave., Cleveland, Ohio 44195. Plaintiff is asserting professional liability claims against Marinescu.

10. Defendant, Marie M. Budev, D.O. ("Budev") was, at all times pertinent hereto, an adult individual who was engaged in the practice of medicine, specifically internal medicine and pulmonology, who is believed to have been duly licensed for such practice under the laws of the State of Ohio, and who maintained a principal place of business located at 2049 E. 100th St., Suite A90, Cleveland, Ohio 44116. Plaintiff is asserting professional liability claims against Budev.

11. Defendant, Louis S. Lam, M.D. ("Lam") was, at all times pertinent hereto, an adult individual who was engaged in the practice of medicine, specifically pulmonology, who is believed to have been duly licensed for such practice under the laws of the State of Ohio, and who maintained a principal place of business located at 9500 Euclid Ave., Cleveland, Ohio 44195. Plaintiff is asserting professional liability claims against Lam.

12.     Clinic, Vachharajani, Reddy, Marinescu, Budev, and Lam will sometimes hereinafter be collectively referred to as "Defendants."

13.     At all times pertinent hereto, Clinic was acting by and through its authorized agents, servants, employees, representatives, staff members, physicians, nurses, volunteers, and ostensible agents, including but not limited to Vachharajani, Reddy, Marinescu, Budev, Lam, Morgan Brinkman, R.N. ("Brinkman"), Kara Showen, R.N. ("Showen"), James Lane, RN ("Lane"), and other members of Clinic's medical and surgical staff who cared for and treated Decedent between his admission to Clinic and his death, all of whom were then and there acting within the course and scope of their employment or apparent employment with and in furtherance of the business operations of and for the financial benefit of Clinic and, thus, Clinic is vicariously liable for their actions and omissions under the doctrine of respondeat superior.

14.     At all times pertinent hereto, Clinic held out to the public, including Plaintiff and Decedent, that it was a skilled and competent medical institution and that its agents, servants, employees, representatives, staff members, physicians, nurses, volunteers, and ostensible agents, including but not limited to  Vachharajani, Reddy, Marinescu, Budev, Lam, Brinkman, Showen, Lane, and other members of Clinic's medical and surgical staff who cared for and treated Decedent between his admission to Clinic and his death, were members in good standing of the medical community, were skilled and competent, and would provide patients, including Decedent, with quality medical care and treatment that met or exceeded the standard of care.

15.     Based upon the representations made by Defendants as to their skill and competency, at all times pertinent hereto, Plaintiff and Decedent relied on the Defendants to render full, complete, accurate, and competent medical care and treatment to Decedent that met or exceeded the standard of care and to not do anything that would cause Decedent any harm.

16. Defendants, for good and valuable compensation and other consideration which Plaintiff and Decedent agreed to pay, actually did pay, and/or was paid on their behalf, undertook and agreed to care for Decedent and perform all reasonable and necessary medical, diagnostic and surgical procedures and to use all requisite, reasonable, necessary, and proper skills in rendering such medical care and treatment.

## JURISDICTION AND VENUE

17. Plaintiff is a citizen of the State of New York.

18. Decedent was a citizen of the State of New York.

19. Defendants are believed to be citizens of the State of Ohio.

20. This action arises under the laws of the State of Ohio and is within the subject matter jurisdiction of this Honorable Court.

21. The amount in controversy, without interest and costs, exceeds the sum or value specified by 28 U.S.C. §1332.5.

22. Venue in this Honorable Court is proper in accordance with the provisions of 28 U.S.C. §1391, in that all Defendants conduct business in, and all the claims set forth herein arose in the Northern District of Ohio, Eastern Division.

## BACKGROUND/FACTUAL HISTORY

23. On November 29, 2017 Decedent underwent a left total knee arthroplasty ("Surgery") at Thompson Health f/k/a F.F. Thompson Hospital in Canandaigua, New York ("Thompson").

24. Prior to the Surgery, Decedent had no history of any pulmonary problems and his last chest x-ray was normal.

25.     On the morning of the Surgery, Decedent denied having any chest pain or shortness of breath, his physical examination was normal, and his lungs were "Clear to auscultation bilaterally."

26.     Prior to the Surgery, Decedent's oxygen saturation level was 99%.

27.     During the Surgery, Decedent's oxygen saturation levels varied between 96% and 98%.

28.     Following Surgery, Decedent's oxygen saturation levels began dropping which necessitated the administration of high quantities of oxygen and he experienced dyspnea and shallow breathing.

29.     Decedent continued to require high quantities of oxygen for several hours after Surgery.

30.     Almost immediately after his discharge the next day, Decedent began experiencing pulmonary symptoms, including difficulty breathing and a lack of stamina.

31.     By February 3, 2018, approximately 8 weeks post-Surgery, Decedent's pulmonary symptoms had progressed to the point he could not walk up a flight of stairs.

32.     Conservative medical treatment was unsuccessful, and Decedent's pulmonary condition continued to deteriorate.

33.     In February 2018, a chest CT was interpreted in relevant part as follows: "Moderate fibrotic changes and bronchiectasis throughout both lungs, likely chronic interstitial disease.  No focal airspace consolidation.  Mild superimposed ground glass Opacities suggest the possibility of mild pulmonary edema versus less likely infection or neoplasm.  Small hiatal hernia.", Decedent was diagnosed with probable "hypersensitivity pneumonitis – inhalation due to an antigen."

34.     Decedent's primary care physician advised him and Plaintiff that Decedent's pulmonary symptoms were the result of an "acute" event.

35.     A bronchoscopy performed on Decedent on March 16, 2018 was interpreted and reported to Decedent and Plaintiff as concerning for eosinophilic drug reaction.

36.     On May 1, 2018, Decedent and Plaintiff were advised that Decedent needed an emergent lung transplant to survive.

37.     Between July 2, 2018 and July 6, 2018 Decedent visited the University of Pittsburgh Medical Center in Pittsburgh, Pennsylvania ("UPMC") for pre-transplant evaluation and testing.

38.     The transplant team at UPMC determined Decedent was completely healthy, except for his lungs.

39.     On September 3, 2018 Decedent underwent a left lung transplant at UPMC.

40.     Pathology on his explanted lung demonstrated hypersensitivity pneumonitis – inhalation due to an antigen.

41.     Post-transplant, Decedent's pulmonary condition continued to deteriorate with significant drops in his oxygen levels and difficulty getting out of bed.

42.     A chest x-ray taken on February 19, 2019, that was compared to a chest x-ray taken on May 24, 2018, was interpreted in relevant part as follows: "There is evidence of left lung transplant.  Left lung is clear.  No evidence of infection.  On the right there is extensive pulmonary fibrosis likely idiopathic fibrosis.  No major change since prior exam.  No acute lung disease."

43.     A chest x-ray taken on March 22, 2019 was interpreted in relevant part as follows: "1. Transplanted left lung fully inflated and clear.  2. Fibrosis and volume loss in native right lung. Increased opacities in right lung which could represent areas of pneumonia (and represents a change from 03/13/2019)."

44.     On April 3, 2019 Decedent was admitted to Thompson Health f/k/a F.F. Thompson Hospital in Canandaigua, New York through the emergency room for treatment of his pulmonary condition.

45.     Within 4 hours of admission, Decedent went into "flash pulmonary edema" and was unable to breathe.

46.     On April 10, 2019, Decedent was transferred to Clinic and was admitted with a diagnosis of sirolimus toxicity pneumonitis.

47.     Although he was intubated for the transfer, immediately before the intubation Decedent was sitting up in bed eating his dinner and had walked the hall.

48.     Upon his arrival, Decedent was admitted to the service of Vachharajani and she and Clinic assigned Decedent's care to Reddy, Marinescu, and Budev.

49.     Decedent was seen by Simon Mucha, M.D. ("Mucha"), an internal medicine specialist who warned the other physicians, nurses, and medical personnel who were caring for Decedent, "This patient has a high probability of sudden, clinically significant deterioration, which requires the highest level of physician preparedness to intervene urgently.  I managed/supervised life or organ supporting interventions that required frequent physician assessment."

50.     As Mucha predicted, there was a sudden, clinically significant deterioration in Decedent's condition.

51.     Decedent was placed and remained on a respirator during his entire admission to Clinic.

52.     Reddy ordered heparin for Decedent which he received throughout his admission.

53.     Throughout his admission, Decedent was also heavily sedated with Propofol and Fentanyl.

54. On April 15, 2019 Turowski told Decedent and Plaintiff that Decedent had "Sirolimus Toxicity Pneumonitis."

55. On April 15, 2019 Reddy noted that Decedent was "interactive at times."

56. Decedent was put on dialysis and a chest tube was inserted in his left side which promptly drained 3000 cc of fluid.

57. On April 17, 2019, Reddy noted that Decedent was "now paralyzed and on fixed doses of sedation…. now in shock."

58. On April 18, 2018 Jason Turowski, M.D. noted "renal function is worrisome."

59. On April 19, 2019 Reddy insisted that Plaintiff make Decedent a "Do Not Resuscitate" patient.

60. When Plaintiff and Decedent refused, Reddy became very angry.

61. On April 21, 2019 Defendants started reducing the amount of propofol and fentanyl Decedent was receiving in hopes of weaning him from his ventilator.

62. Later that day, Decedent woke up, smiled at his family, including Plaintiff, and communicated by blinking his eyes when prompted.

63. On April 21, 2019 Decedent's need for oxygen was dropping, and his kidney function was returning to normal.

64. When Plaintiff and her daughter, Meghan arrived at Clinic on April 22, 2019, they immediately noticed a difference in Decedent's appearance.

65. Specifically, Decedent was lying flat in bed, appeared more "rigid" and his beard had been shaved without his consent.

66. At one point, Decedent opened his eyes, had a fixed stare, and he drooled a large amount of clear fluid.

67.     Later that morning, Decedent's blood pressure dropped to 82/54 from the 116/56 it had been on April 21, 2019.

68.     When Lane took over for Brinkman at approximately 11:00 a.m., Plaintiff informed him of Decedent's low blood pressure and drooling.

69.     Lane said, "That is normal," which it was not.

70.     In fact, Lane did not take seriously and did not promptly act upon the information Plaintiff provided regarding Decedent's symptoms, complaints, and issues.

71.     Because they were late rounding on April 22, 2019, Plaintiff never had a chance to inform Decedent's physicians of the significant changes in Decedent's condition.

72.     At approximately 12:09 p.m. Decedent arrested.

73.     After Decedent was revived, he arrested a second time.

74.     During the resuscitation efforts following Decedent's second arrest, approximately 2 liters of blood was drained from his endotracheal tube.

75.     An emergent bronchoscopy showed pink frothy secretions and no overt bleeding on the left and right lungs.

76.     Decedent's airway continued to fill with blood, making ventilation difficult.

77.     Decedent then arrested a third time.

78.     After Decedent's third arrest, Budev pulled Plaintiff aside and admitted to her that Decedent's heparin level was significantly above the therapeutic level which was causing Decedent to bleed internally.

79.     Budev recommended to Plaintiff that all resuscitation efforts be terminated because it would be difficult for Decedent to recover from the broken ribs he suffered during the resuscitation efforts, and his lung disease.

80.     Marinescu agreed and all resuscitation efforts were terminated as of approximately 1:35 p.m.

81.     On April 22, 2019 at approximately 2:09 p.m., Decedent died.

82.     In his Certificate of Death, which was signed by Lam on April 26, 2019 and Plaintiff received on or about May 6, 2019, Decedent's immediate cause of death was listed as "Hemorrhagic Shock due to Acute on Chronic Hypoxemic Respiratory Failure."

83.     An autopsy performed by noted forensic pathologist, Cyril H. Wecht, M.D., J.D. on April 25, 2019 resulted in final pathological diagnoses which included, inter alia, fibrotic lung with superimposed acute lung injury, right lung.

84.     Plaintiff did not receive Dr. Wecht's autopsy report until on or about May 6, 2019.

85.     Postmortem forensic toxicology testing revealed the presence of "4-ANPP, laudanosine, voriconazole, fluoxetine and metabolite, and fentanyl and metabolite in post-mortem samples."

86.     The postmortem forensic toxicology testing report is dated June 13, 2019.

87.     "The fentanyl level was 49 ng/mL and the metabolite norfentanyl 36 ng/mL. The 4-ANPP level was 0.30 ng/mL."

88.     A nursing note in Decedent's medical chart that was authored by Brinkman, his primary nurse stated, "During last 2 hours of life patient received 4Liters (4,000 CC) Normal saline. 7 PRBC. 3FFP. ("Nursing Note")"

89.     The Nursing Note establishes that before the last two hours of his life, the toxicology results referenced in paragraph 80 above would have been significantly higher and/or Decedent was given high doses of fentanyl in the last two hours of his life.

90.     In fact, the Nursing Notes and toxicology results prove that in the 30 hours prior to his death, Decedent was given high doses of Fentanyl by Brinkman and Showen.

91.     In the CPR report that documented Decedent's arrests, it was noted that during CPR Decedent had a melanotic bowel movement which was indicative of blood in his stool.

92.     Since receiving Decedent's hospital records, autopsy report, and postmortem forensic toxicology testing report, Plaintiff has also discovered that for at least 35 hours before he arrested the first time Decedent's heparin level had been well over therapeutic levels and that he had likely been bleeding internally throughout most, if not all of that time which in turn caused or contributed to Decedent's arrests and death.

93.     Until she received and was able to review Decedent's hospital records, autopsy report, and postmortem forensic toxicology testing report, there was no way for Plaintiff to know that Decedent may have been the victim of medical malpractice at Cleveland Clinic which could not and did not occur until on or shortly after June 13, 2019.

94.     As a direct, proximate, factual, and legal result of Defendants' individual and collective actions, inactions, errors, omissions, deviation from the standard of care, and professional malpractice, Decedent became acutely ill; he suffered an increased risk of harm and/or complications he would not have otherwise suffered, including a severe impairment of his general health, strength and vitality and a significant loss of his strength, ambulatory capabilities, mobility, and dexterity; he suffered a severe limitation of his activities, including the inability to engage in his normal daily activities; he was unable to enjoy the ordinary pleasures of life; his morbidity drastically increased; he suffered an increased risk of harm and a diminished opportunity to survive, a reduced life expectancy, and a fear of death; and he ultimately bled to death in large part because he was severely over-medicated.

95.     Because of his death, Decedent has suffered a loss of income, including his retirement benefits and/or social security income.

96.     Prior to his death, Decedent contributed significantly to the financial, emotional and physical support of Plaintiff and his children.

97.     As a direct, proximate, factual, and legal result of Defendants' individual and collective actions, inactions, errors, omissions, deviation from the standard of care, and professional malpractice, and as a result of the wrongful death of Decedent, Plaintiff and his children have been damaged, jointly and severally, because of Decedent's severe, extreme, and conscious physical pain, suffering, anxiety, depression, embarrassment, humiliation, emotional distress, mental anguish, inconvenience, physical limitations, and loss of life; the permanent deprivation and loss of the financial support and all pecuniary benefits Decedent would have provided to Plaintiff and his children; and the loss of Decedent's love, services, assistance, guidance, counseling, advice, companionship, society, consortium, and other contributions Decedent would have provided during his lifetime, jointly and severally against all Defendants as well as liability under the doctrines of respondeat superior, vicarious liability, and piercing the corporate veil, plus punitive damages for Defendants' grossly negligent conduct, to deter future such conduct.

## COUNT I

**PLAINTIFF V. DEFENDANTS, CLEVELAND CLINIC FOUNDATION, VIDULA T. VACHHARAJANI, M.D., ANITA JUNUTHULA REDDY, MARK A. MARINESCU, MARIE M. BUDEV, D.O., AND LOUIS S. LAM, M.D.**

### NEGLIGENCE, CARELESSNESS AND RECKLESSNESS

98.     Plaintiff incorporates herein by reference as though fully set forth at length paragraphs 1 through 97 above.

99.     The aforementioned severe, serious and permanent injuries, damages, losses, and harm suffered by Plaintiff and Decedent were the direct, proximate, factual, and legal result of

14

Defendants' carelessness, recklessness, negligence, malpractice and deviation from the standard of care, generally and in the following particulars:

a.     In administering to Decedent lethal overdoses of Heparin that not only caused him to bleed internally but ultimately caused and/or contributed to his death;

b.     In failing to warn Decedent and his family members that they had administered and/or were still administering lethal overdoses of Heparin to Decedent;

c.     In administering to Decedent lethal overdoses of Fentanyl;

d.     In administering to Decedent Fentanyl which was not pure and/or was contaminated which caused and/or contributed to his death;

e.     In failing to recognize the Fentanyl they were administering to Decedent was not of good quality, was not safe for its intended use and purpose, was not free from defects, and would injure or otherwise harm Decedent;

f.     In failing to recognize the Fentanyl they were administering to Decedent had been tampered with and/or contaminated;

g.     In failing to warn Decedent and his family members that the Fentanyl they were administering to Decedent was not of good quality; was defective, dangerous, and unsafe for its intended use and purpose; was not pure; was not free from defects; and would injure or otherwise harm Decedent;

h.     In failing to properly treat, manage, and control Decedent's medical condition;

i.     In failing to properly treat, manage, and control Decedent's sirolimus toxicity pneumonitis;

j.     In failing to protect Decedent from the injuries and harm he suffered while he was in their custody, care, and control;

k.     In failing to listen to, heed, and promptly act upon the information Plaintiff provided regarding Decedent's symptoms, complaints, and issues;

l.     In failing to recognize and appreciate that Decedent's symptoms and complaints were indicative of an acute and life-threatening condition;

m.     In failing to timely, accurately, and properly diagnose and treat Decedent's other medical symptoms and conditions;

n.    In failing to timely render appropriate and necessary medical care and treatment to Decedent and otherwise take the steps necessary to reverse the effects of the medications they administered to Decedent;

o.    In failing to refer Decedent to specialists who possessed the requisite education, training, knowledge, skill, and expertise necessary to properly diagnose and treat Decedent's condition and who would timely render appropriate and necessary medical care and treatment to Decedent and otherwise take the steps necessary to reverse the effects of the medications that were administered to Decedent;

p.    In causing the loss of preferable treatment options that would have otherwise been available to Decedent;

q.    In failing to possess the requisite education, training, knowledge, skill, and expertise necessary to diagnose and treat Decedent's condition;

r.    In failing to refer Decedent to medical specialists who possessed the requisite education, training, knowledge, skill, and expertise necessary to properly diagnose and treat Decedent's condition;

s.    In failing to inform Plaintiff and Decedent that they lacked the education, training, knowledge, skill, and expertise necessary to properly diagnose and treat Decedent's condition;

t.    In failing to fully appreciate and understand the significance of Decedent's symptoms, complaints, and other clinical information;

u.    In failing to inform Plaintiff and Decedent that Decedent's condition would rapidly deteriorate without appropriate and necessary medical care and treatment;

v.    In failing to ensure Decedent received the proper and necessary medical and surgical care and treatment his condition required under the circumstances;

w.    In failing to fully, properly, appropriately, and accurately advise Plaintiff and Decedent of the exact nature of Decedent's medical condition and the medical care and treatment that was necessary to properly treat that condition;

x.    In causing a delay in the diagnosis and treatment of Decedent's acute and life-threatening condition;

y.    In causing a prolonged and very painful treatment process, including diagnostic tests, studies, invasive procedures, and resuscitation efforts that would not have been necessary had Defendants timely and correctly diagnosed and treated his condition;

z.     In failing to know, understand, and appreciate that any failure to promptly diagnose and treat Decedent's acute and life-threatening condition would substantially increase the pain and suffering Decedent would experience and ultimately cause his death;

aa.     In failing to know, understand, and appreciate that any failure to promptly diagnose and treat Decedent's acute and life-threatening condition would substantially diminish Decedent's quality of life and functionality and cause his death;

bb.     In causing Decedent to suffer an increased risk of harm, future complications, and death;

cc.     In causing Decedent to suffer a diminished opportunity to survive;

dd.     In causing Decedent to suffer severe pain, suffering, inconvenience, embarrassment, and mental anguish than he otherwise would not have experienced;

ee.     In causing and/or contributing to Decedent's death;

ff.     In causing Plaintiff and Decedent to spend large sums of money for medical and surgical attention, hospitalization, medical supplies, surgical appliances, medicines, and attendant services that would not have otherwise been necessary;

gg.     In disregarding or failing to timely and properly act upon the clinical and diagnostic information that was available to them;

hh.     In failing and neglecting to take proper and adequate precautions to make certain Decedent's condition was properly and timely diagnosed and treated.

ii.     In failing to inform Plaintiff and Decedent of their aforesaid acts and/or omissions; and

jj.     In failing to adhere to and provide medical care and treatment to Decedent in accordance with the standard of care within the medical community.

100.    As a direct, proximate, factual, and legal result of Defendants' individual and collective actions, inactions, errors, omissions, deviation from the standard of care, professional malpractice, and as a result of the wrongful death of Decedent, Plaintiff and Decedent have suffered

the aforementioned severe, serious and permanent injuries, damages, losses, and harm which warrants the imposition of punitive damages against Defendants.

WHEREFORE, Plaintiff, Bonita A. Powers, individually and as Executrix of the Estate of James C. Powers, Deceased, demands judgment in her favor and against Defendants, Cleveland Clinic Foundation, Vidula T. Vachharajani, M.D., Anita Junuthula Reddy, Mark A. Marinescu, Marie M. Budev, D.O., and Louis S. Lam, M.D. in an amount in excess of $75,000, together with punitive damages, attorneys' fees, costs, pre-judgment and post-judgment interest, and such other relief as this Honorable Court deems appropriate.

## COUNT II

## PLAINTIFF V. DEFENDANT, CLEVELAND CLINIC FOUNDATION

## <u>STRICT PRODUCTS LIABILITY-DESIGN DEFECT</u>

101.    Plaintiff incorporates herein by reference as though fully set forth at length paragraphs 1 through 100 above.

102.    Throughout his admission, Clinic sold, supplied, distributed, and administered to Decedent Fentanyl it expressly and/or impliedly represented and warranted would be quality Fentanyl that met or exceeded all applicable standards, was safe for its intended use and purpose, was free from defects of any kind, and would not injure or otherwise harm Decedent.

103.    The Fentanyl Clinic sold, supplied, distributed, and administered to Decedent was defective and unreasonably dangerous, generally and/or because it contained impurities.

104.    The Fentanyl was defectively designed when it left Clinic's custody and control in that it differed substantially from their intended design, specifications, and result and from other ostensibly identical or substantially similar Fentanyl.

105.    The Fentanyl Clinic sold, supplied, distributed, and administered to Decedent caused and/or contributed to his death.

106.    The Fentanyl Clinic sold, supplied, distributed, and administered to Decedent was defective, unsafe for its intended purpose and unreasonably dangerous.

107.    The Fentanyl Clinic sold, supplied, distributed, and administered to Decedent was placed into the stream of commerce and was administered to Decedent in a defective and unreasonably dangerous condition in that the foreseeable risks substantially outweighed the potential benefits of the design, formulation, and use of the Fentanyl.

108.    The Fentanyl Clinic sold, supplied, distributed, and administered to Decedent was defective in design and/or formulation in that when it was placed in the stream of commerce and was administered to Decedent, it failed to perform as safely as an ordinary customer would expect in that the Fentanyl did cause serious and permanent injuries as averred herein, and was more dangerous than alternate Fentanyl while being used in a reasonably foreseeable manner, thereby rendering the Fentanyl defective, unsafe, and dangerous for use.

109.    The Fentanyl Clinic sold, supplied, distributed, and administered to Decedent was, when in left its custody and control, defective and unreasonably dangerous for its ordinary and expected use.

110.    The Fentanyl Clinic sold, supplied, distributed, and administered to Decedent was intended to reach Decedent in the condition it was in when it left their custody and control.

111.    Plaintiff and Decedent were not aware of the unsafe, defective and dangerous condition of and the dangers associated with the Fentanyl when it left the custody and control of Clinic and was administered to Decedent, because they were not recognizable by users and Clinic

failed to warn and/or adequately warn Plaintiff and Decedent of the risks associated with the Fentanyl.

112.     Under Ohio product liability law, Clinic is strictly liable to Plaintiff for the design defects in the Fentanyl without regard to proof of negligence or gross negligence.

113.     As a direct, proximate, factual, and legal result of Clinic's actions, inactions, errors, omissions, deviation from the standard of care, professional malpractice, strict products liability, and as a result of the wrongful death of Decedent, Plaintiff and Decedent have suffered the aforementioned severe, serious and permanent injuries, damages, losses, and harm which warrants the imposition of punitive damages against Clinic.

WHEREFORE, Plaintiff, Bonita A. Powers, individually and as Executrix of the Estate of James C. Powers, Deceased, demands judgment in her favor and against Defendant, Cleveland Clinic Foundation, in an amount in excess of $75,000, together with punitive damages, attorneys' fees, costs, pre-judgment and post-judgment interest, and such other relief as this Honorable Court deems appropriate.


## COUNT III

### PLAINTIFF V. DEFENDANT, CLEVELAND CLINIC FOUNDATION

### STRICT PRODUCTS LIABILITY-MANUFACTURING DEFECT

114.     Plaintiff incorporates herein by reference as though fully set forth at length paragraphs 1 through 113 above.

115.     Throughout his admission, Clinic sold, supplied, distributed, and administered to Decedent Fentanyl it expressly and/or impliedly represented and warranted would be quality

Fentanyl that met or exceeded all applicable standards, was safe for its intended use and purpose, was free from defects of any kind, and would not injure or otherwise harm Decedent.

116.    The Fentanyl Clinic sold, supplied, distributed, and administered to Decedent was defective and unreasonably dangerous, generally and/or because it contained impurities.

117.    The Fentanyl Clinic sold, supplied, distributed, and administered to Decedent was prescribed and used in the manner Plaintiff, Decedent, and Clinic expected and intended.

118.    The Fentanyl Clinic sold, supplied, distributed, and administered to Decedent was defectively manufactured when it left its custody and control in that it differed substantially from the intended design, specifications, and results and from other ostensibly identical or substantially similar Fentanyl.

119.    The Fentanyl Clinic sold, supplied, distributed, and administered to Decedent caused and/or contributed to Decedent's death.

120.    The Fentanyl Clinic sold, supplied, distributed, and administered to Decedent was defective, unsafe for its intended purpose and unreasonably dangerous.

121.    The Fentanyl Clinic sold, supplied, distributed, and administered to Decedent was placed into the stream of commerce and was administered to Decedent in a defective and unreasonably dangerous condition in that the foreseeable risks substantially outweighed the potential benefits of the Fentanyl.

122.    The Fentanyl Clinic sold, supplied, distributed, and administered to Decedent was defective in design and/or formulation in that when it was placed in the stream of commerce and was administered to Decedent, it failed to perform as safely as an ordinary customer would expect in that the Fentanyl did cause serious and permanent injuries as averred herein, and was more dangerous

than alternate Fentanyl while being used in a reasonably foreseeable manner, thereby rendering the Fentanyl defective, unsafe, and dangerous for use.

123. The Fentanyl Clinic sold, supplied, distributed, and administered to Decedent was, when in left its custody and control, defective and unreasonably dangerous for its ordinary and expected use.

124. The Fentanyl Clinic sold, supplied, distributed, and administered to Decedent was intended to reach Decedent in the condition it was in when it left Clinic's custody and control.

125. Plaintiff and Decedent were not aware of the unsafe, defective and dangerous condition of and the dangers associated with the Fentanyl when it left the custody and control of Clinic and was administered to Decedent, because they were not recognizable by users and Clinic failed to warn and/or adequately warn Plaintiff and Decedent of the risks associated with the Fentanyl.

126. Under Ohio product liability law, Clinic is strictly liable to Plaintiff for the design defects in the Fentanyl without regard to proof of negligence or gross negligence.

127. As a direct, proximate, factual, and legal result of Clinic's actions, inactions, errors, omissions, deviation from the standard of care, professional malpractice, strict products liability, and as a result of the wrongful death of Decedent, Plaintiff and Decedent have suffered the aforementioned severe, serious and permanent injuries, damages, losses, and harm which warrants the imposition of punitive damages against Clinic.

WHEREFORE, Plaintiff, Bonita A. Powers, individually and as Executrix of the Estate of James C. Powers, Deceased, demands judgment in her favor and against Defendant, Cleveland Clinic Foundation in an amount in excess of $75,000, together with punitive damages, attorneys'

fees, costs, pre-judgment and post-judgment interest, and such other relief as this Honorable Court deems appropriate.

## COUNT IV

## PLAINTIFF V. DEFENDANT, CLEVELAND CLINIC FOUNDATION, STRICT PRODUCTS LIABILITY-FAILURE TO WARN

128.    Plaintiff incorporates herein by reference as though fully set forth at length paragraphs 1 through 127 above.

129.    Throughout his admission, Clinic sold, supplied, distributed, and administered to Decedent Fentanyl it expressly and/or impliedly represented and warranted would be quality Fentanyl that met or exceeded all applicable standards, was safe for its intended use and purpose, was free from defects of any kind, and would not injure or otherwise harm Decedent.

130.    The Fentanyl Clinic sold, supplied, distributed, and administered to Decedent was defective and unreasonably dangerous, generally and/or because it contained impurities.

131.    The Fentanyl Clinic sold, supplied, distributed, and administered to Decedent was defective and unreasonably dangerous, generally and/or because Defendants failed to warn and/or adequately warn Plaintiff and Decedent of the design and manufacturing defects in and risks associated with the Fentanyl.

132.    Plaintiff and Decedent had no way of knowing of the design and manufacturing defects in and risks associated with the Fentanyl.

133.    The warnings Clinic gave were inaccurate, unclear, incomplete, and/or ambiguous and failed to warn consumers, including Plaintiff and Decedent of the design and manufacturing defects in and risks associated with the Fentanyl.

134.    Had Plaintiff and Decedent been warned of the design and manufacturing defects in and risks associated with the Fentanyl, Decedent would not have allowed Defendants to administer the Fentanyl and he would not have suffered the aforementioned severe, serious and permanent injuries, damages, losses, and harm, including his death.

135.    Under Ohio product liability law, Clinic is strictly liable to Plaintiff for their failure to warn without regard to proof of negligence or gross negligence.

136.    As a direct, proximate, factual, and legal result of Clinic's actions, inactions, errors, omissions, deviation from the standard of care, professional malpractice, failure to warn and/or adequately warn, and as a result of the wrongful death of Decedent, Plaintiff and Decedent have suffered the aforementioned severe, serious and permanent injuries, damages, losses, and harm which warrants the imposition of punitive damages against Defendants.

WHEREFORE, Plaintiff, Bonita A. Powers, individually and as Executrix of the Estate of James C. Powers, Deceased, demands judgment in her favor and against Defendant, Cleveland Clinic Foundation, in an amount in excess of $75,000, together with punitive damages, attorneys' fees, costs, pre-judgment and post-judgment interest, and such other relief as this Honorable Court deems appropriate.

## COUNT V

## PLAINTIFF V. DEFENDANT, CLEVELAND CLINIC FOUNDATION

## BREACH OF EXPRESS AND IMPLIED WARRANTY

137.    Plaintiff incorporates herein by reference as though fully set forth at length paragraphs 1 through 136 above.

138.     Throughout his admission, Clinic sold, supplied, distributed, and administered to Decedent Fentanyl it expressly and/or impliedly represented and warranted would be quality Fentanyl that met or exceeded all applicable standards, was safe for its intended use and purpose, was free from defects of any kind, and would not injure or otherwise harm Decedent.

139.     For the reasons set forth above, Clinic breached the express and/or implied warranties it made regarding the Fentanyl which constituted a serious danger to Plaintiff.

140.     As a direct, proximate, factual, and legal result of Clinic's actions, inactions, errors, omissions, deviation from the standard of care, professional malpractice, failure to warn and/or adequately warn, and as a result of the wrongful death of Decedent, Plaintiff and Decedent have suffered the aforementioned severe, serious and permanent injuries, damages, losses, and harm which warrants the imposition of punitive damages against Clinic.

WHEREFORE, Plaintiff, Bonita A. Powers, individually and as Executrix of the Estate of James C. Powers, Deceased, demands judgment in her favor and against Defendant, Cleveland Clinic Foundation, in an amount in excess of $75,000, together with punitive damages, attorneys' fees, costs, pre-judgment and post-judgment interest, and such other relief as this Honorable Court deems appropriate.

## COUNT VI

## PLAINTIFF V. DEFENDANT, CLEVELAND CLINIC FOUNDATION

## PROFESSIONAL NEGLIGENCE/CORPORATE LIABILITY/VICARIOUS LIABILITY

141.     Plaintiff incorporates herein by reference as though fully set forth at length the averments set forth in paragraphs 1 through 140 above.

142.    At all times pertinent hereto, Clinic had a duty to ensure that all persons providing care within its facility were competent to provide that care.

143.    At all times pertinent hereto, Vachharajani, Reddy, Marinescu, Budev, Lam, Brinkman, Showen, Lane, and other members of Clinic's medical and surgical staff who cared for and treated Decedent between his admission to Clinic and his death were acting in the course and scope of their employment with and as an agent, servant, employee, or representative of Clinic.

144.    At all times pertinent hereto, Clinic had a duty, responsibility, and obligation to its patients, including Decedent, to furnish reasonable, prudent, professional, appropriate, and competent medical care and treatment.

145.    At all times pertinent hereto, Clinic had a duty, responsibility, and obligation to establish proper procedures and protocols to protect patients, like Decedent, from the events referenced above.

146.    As part of its duties, responsibilities and obligations, Clinic had a duty, responsibility, and obligation to establish policies and procedures and employ competent medical personnel and other staff members who would ensure that the appropriate quality of medical care and treatment was delivered to its patients.

147.    Clinic was responsible for the standard of professional practice by members of its medical staff.

148.    Clinic failed to exercise the judgment of a reasonable health care provider, generally and in the following particulars:

      a.    In failing to have physicians appropriate in number, training, education, and/or experience to properly diagnose and treat Decedent and/or make decisions regarding his medical care and treatment when it knew or should have known of the need for such measures and the fact that such measures did not exist when they were endeavoring to care for and treat Decedent;

b.     In failing to adopt and/or enforce appropriate rules, regulations, guidelines, procedures, protocols, security measures, and other directives with respect to the proper management and administration of medications to patients, including Decedent to ensure they did not receive lethal overdoses of medications;

c.     In failing to adopt and/or enforce appropriate rules, regulations, guidelines, procedures, protocols, security measures, and other directives with respect to the protection of patients from receiving lethal overdoses of medications that were ordered and/or administered by its physicians and staff members;

d.     In failing to adopt and/or enforce appropriate rules, regulations, guidelines, procedures, protocols, security measures, and other directives with respect to the verification of the purity of the medications that were ordered and/or administered by its physicians and staff members; and

e.     In failing to adopt and/or enforce appropriate rules, regulations, guidelines, procedures, protocols, security measures, and other directives that would have required any physician, nurse, physician's assistant, or other member of its medical staff to immediately report to members of its management team the fact that Decedent had received lethal overdoses of medications, some of which were tainted, that were ordered and/or administered by its physicians and staff members.

149.    As a direct, proximate, factual, and legal result of the carelessness, recklessness, negligence, malpractice and deviation from the standard of care of Clinic, corporately and through its agents, servants, employees, representatives, and staff members, including Vachharajani, Reddy, Marinescu, Budev, Lam, Brinkman, Showen, Lane, and other members of Clinic's medical and surgical staff who cared for and treated Decedent between his admission to Clinic and his death, thereby resulting in vicarious liability under principals of respondeat superior and ostensible agency, Plaintiff and Decedent have suffered and will continue to suffer the severe, serious and permanent injuries, damages, losses, and harm referenced herein which warrants the imposition of punitive damages against Clinic.

WHEREFORE, Plaintiff, Bonita A. Powers, individually and as executrix of the Estate of James C. Powers, Deceased, demands judgment in her favor and against Defendant, Cleveland Clinic Foundation, in an amount in excess of $75,000, together with punitive damages, attorneys' fees,

costs, pre-judgment and post-judgment interest, and such other relief as this Honorable Court deems

appropriate.

Respectfully Submitted,


_/s/ Nomiki P. Tsarnas_
Nomiki P. Tsarnas, Esquire (0076134)
Kisling, Nestico & Redick
22 E. McKinley Way, Suite A
Poland, OH 445149999999
tsarnas@knrlegal.com
(330) 729-1090
As Local Counsel to George R. Farneth II and
The Farneth Law Group, LLC


_/s/ George R. Farneth, II_
George R. Farneth II, Esquire
The Farneth Law Group, LLC
445 Fort Pitt Blvd., Suite 160
Pittsburgh, PA 15219 (Primary Address)
845 Charles Street
Wellsburg, WV  26070
grf@farnethlaw.com
PA ID# 53914
WV ID# 10749
(412) 977-7779